**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------- x
          :

BARZA DEVELOPMENT CORP.; ZUMON     :    Case No.: 1:16-cv-07763
CORPORATION; and UNITED STATES      :
AMBASSADOR CESAR B. CABRERA      :
RETIRED,                           :    **VERIFIED COMPLAINT**
          :
         Plaintiffs,         :    (JURY TRIAL DEMANDED)
          :
     - against -         :
          :
MEISTER SEELIG & FEIN LLP; and     :
STEPHEN B. MEISTER,        :
          :
         Defendants.       :
          :
-------------------------------------------------------- x

Plaintiffs Barza Development Corp. ("Barza"), Zumon Corporation ("Zumon"), and

United States Ambassador Cesar B. Cabrera Retired ("Cabrera" or the "Ambassador," and

together with Barza and Zumon, the "Plaintiffs"), as and for their complaint against defendants

Meister Seelig & Fein LLP ("MSF") and Stephen B. Meister ("Meister," and together with MSF,

the "Defendants"), allege upon knowledge as to themselves and upon information and belief as

to all other matters, as follows:

### PRELIMINARY STATEMENT

1.     This legal malpractice action arises not just from Defendants' egregious

negligence in failing to represent Plaintiffs properly, but from their deliberate and shocking

decision to favor their own business interests over the interests of their clients.

2.     Cabrera and two real estate investment companies he owns, Barza and Zumon,

retained MSF, a New York law firm, and Meister, MSF's founding partner, in September 2013

to represent them in a dispute with Caribbean Property Group ("CPG") concerning CPG's fraud

and bad faith during failed negotiations for the sale of Plaintiffs' real estate in Puerto Rico to

CPG.  Meister and MSF convinced Plaintiffs to retain them by billing themselves as a "regional Puerto Rico expert," and promising to protect Plaintiffs' litigation interests, by either bringing about an early favorable settlement, or vigorously pursuing Plaintiffs' claims against CPG. Meister disclosed that he had a prior relationship with CPG, but claimed it made him particularly well-suited to advocate on Plaintiffs' behalf.

3.      Meister and MSF included in their retention agreement a provision providing that Defendants would receive hundreds of thousands of dollars if they secured an early settlement that included a sale to CPG.  However, once Defendants determined that it was unlikely that the sale could be resurrected -- and that there was no easy money to be made -- they decided to abandon their representation of Plaintiffs, rather than press claims against CPG, a former client.

4.      Plaintiffs' underlying claims against CPG arise from CPG's February 5, 2013 negotiations with Plaintiffs, during which CPG promised to make an offer to purchase the real estate at issue within thirty days, in exchange for Plaintiffs' promise that they would decline any intervening offers from third parties.  Less than ten days later -- in accordance with their good-faith negotiations with CPG and promise to forbear -- Plaintiffs rejected an offer from a potential buyer to purchase the property for $33 million.  Unbeknownst to Plaintiffs, however, CPG had no intention of honoring its February 5 promise, but instead was working behind the scenes with Plaintiffs' lender to acquire a loan encumbering the property in order to call it, and pressure Plaintiffs into a fire sale of the property at a below-market price.

5.      In breach of its February 5 promise, CPG never provided Plaintiffs with any offer, despite Plaintiffs' rejection of an intervening $33 million offer.  Instead, CPG called the loan immediately after acquiring it, and cut off all communications with Plaintiffs when -- after

liquidating other assets -- Plaintiffs managed to pay off the loan in full, and thereby destroy CPG's leverage to obtain a below-market price for the property.

6.     Notwithstanding CPG's illegal conduct, Defendants, after being retained by Plaintiffs, utterly failed, among other things, to investigate and pursue Plaintiffs' claims against CPG, or take any other steps to protect Plaintiffs' interests.

7.     As a direct result of Defendants' malpractice and utter dereliction of their duties to Plaintiffs, the statute of limitations governing Plaintiffs' Puerto Rican tort claims against CPG expired, including but not limited to claims for promissory estoppel and *culpa in contrahendo*, a civil law tort that is expressly recognized by Puerto Rican Courts.  As a result, Plaintiffs lost their right to pursue remedies against CPG for its misconduct.  Because of Defendants' deliberate and premeditated malpractice, Plaintiffs were damaged in an amount to be determined at trial, but not less than $33 million.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

9.     This Court has personal jurisdiction over Defendants because Meister Seelig & Fein LLP is a limited liability partnership registered to do business in and organized under the laws of New York, and its principal place of business is New York.  Furthermore, defendant Steven B. Meister is domiciled in New York, and is a registered attorney whose principal place of business is in New York.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the relevant acts, transactions, occurrences and omissions alleged herein occurred in this District, and

Defendants conducted business here, including but not limited to, in connection with the events described herein.

## PARTIES

11.     Plaintiff Cesar Cabrera, a retired United States Ambassador, is an individual residing in San Juan, Puerto Rico.  Ambassador Cabrera is the president, CEO and sole owner of Barza and Zumon.

12.     Plaintiff Barza Development Corp. is a company organized pursuant to the laws of Puerto Rico, with its principal place of business at Ave. Hostos 502, San Juan, PR 00918.

13.     Plaintiff Zumon Corporation is a company organized pursuant to the laws of Puerto Rico, with its principal place of business at Ave. Hostos 502, San Juan, PR 00918.

14.     Defendant Meister Seelig & Fein LLP is a limited liability partnership, organized pursuant to the laws of New York, with its principal place of business at 125 Park Avenue, 7th Floor, New York, NY 10017.

15.     Defendant Stephen B. Meister, a founding partner and principal of MSF, is an individual residing in New York.

## RELEVANT NON-PARTIES

16.     Non-party Caribbean Property Group Real Estate is a private equity firm focused on real estate investments in the Caribbean and South America, with its principal place of business at 88 University Place, New York, NY 10003.

17.     Non-party Caribbean Property Group LLC was a subsidiary or affiliate of Caribbean Property Group Real Estate and/or its predecessor in interest, with its principal place of business located at 1114 Avenue of the Americas, New York, NY 10110.

## FACTS

### I.     Plaintiffs And The D'Art Gallery Plaza

18.     Barza Development Corp. and Zumon Corporation were founded in 2001 and 2004, respectively, by United States Ambassador Retired to the Republic of Mauritius and the Republic of Seychelles, Cesar B. Cabrera.  Ambassador Cabrera is currently president of both Barza and Zumon, and has held those titles at all times relevant to the allegations contained in this complaint.  Barza and Zumon are both engaged primarily in the development of real estate on the island of Puerto Rico, and other real estate related activities.

19.     On September 9, 2003 and November 1, 2005, Barza acquired two contiguous parcels of land, totaling approximately 51 acres located in the Barceloneta municipality of northern Puerto Rico (the "Barza Parcel").  On March 31, 2011, Zumon acquired from the municipality of Barceloneta an exclusive and renewable option to purchase an approximately 14-acre parcel of land contiguous with the Barza Parcel (the "Zumon Parcel").  Together the Barza and Zumon Parcels comprise an approximately 65-acre tract of land (the "Property").

20.     Ambassador Cabrera sought to rezone the property and obtain permits necessary for development.

21.     Ambassador Cabrera also restructured prior debt secured by the Barza Parcel into a short term loan agreement and line of credit worth approximately $1,500,000.00 (the "Loan"). The Loan's term expired on October 31, 2011.

### II.    Plaintiffs Enter Into Negotiations With CPG

22.     Plaintiffs have invested millions of dollars in the Property in the process of acquiring zoning designations and permits, and leveraged those improvements in their search for potential business partners to co-develop the Property.

23.     Among other potential business partners, Ambassador Cabrera spoke with Matthew Karp of CPG, a well-known developer in the region.  Mr. Karp was responsible for the company's commercial real estate acquisitions in Puerto Rico.

24.     In or about October 2011, Ambassador Cabrera and Mr. Karp met in New York City.  During that meeting, Mr. Karp expressed a strong interest in the Property.  At that time, Mr. Karp represented his view that the Property was likely worth between $125.00 and $175.00 per square meter.

25.     Mr. Karp conveyed that CPG would consider purchasing the Property outright, or entering into a joint venture with Plaintiffs to develop it, after certain regulatory hurdles were cleared.  Thereafter, CPG sought a confidentiality agreement with Barza to facilitate the exchange of information related to the Property, including its permitting and zoning status.

### III.     CPG Consistently Reaffirms Its Interest In A Deal

26.     After the initial meeting with the Ambassador, CPG consistently reaffirmed its interest in the Property.

27.     Within a week, Mr. Karp sent Ambassador Cabrera CPG's proposed contract. Although it was called a "confidentiality agreement," it was actually a due diligence agreement designed to facilitate and protect the exchange of information between CPG and Barza during a due diligence period on a potential transaction involving the Property.

28.     Ambassador Cabrera executed the agreement soon thereafter (the "CPG Agreement").  The CPG Agreement was entered into by Barza and Zumon, and Caribbean Property Group LLC.  In pertinent part, the CPG Agreement states that:

> Whereas [CPG] has indicated an interest in potentially purchasing [the Property] from [Barza] (the "Transaction"), and has requested the opportunity to review certain information . . . (collectively, the "Confidential Information") relating to such a Transaction . . . . [CPG] agrees to maintain the confidentiality of the

6

Confidential Information . . . . and shall use the Confidential Information solely for the purpose of determining whether or not to proceed with the Transaction.

29.     Mr. Karp immediately sought confidential information about the Property, including the status of its permits and the name and contact information for Barza's permitting consultant.  Mr. Karp also reiterated his interest in meeting with Ambassador Cabrera at the Property.

30.     In response to Mr. Karp's request, Ambassador Cabrera arranged for Mr. Karp and his supervisor, Samuel Kirschner, to visit the Property.  At or about the same time, Mr. Karp requested additional information about the status of the permits for the Property.

31.     Mr. Karp soon set a follow-up meeting with Ambassador Cabrera to discuss the fair market valuation of the Property.  At that time, Mr. Karp and Ambassador Cabrera reviewed a recent appraisal of the property estimating the Property's value at $33 million.

32.     The next day, Mr. Karp followed up with Ambassador Cabrera to ensure that he understood the status of certain zoning designations and permits, the acquisition of which formed the basis of the appraisal they had discussed during their meeting.

33.     Thereafter, Plaintiffs permitted their consultants to cooperate with CPG and its consultants, and to provide all documents and information sought by CPG or its agents to confirm the status of the relevant zoning and permitting.

34.     Plaintiffs' consultants confirmed that Plaintiffs had already acquired all necessary permitting assumed in the appraisal.

35.     Throughout this entire period, Mr. Karp repeatedly emphasized CPG's continuing interest in purchasing the Property, in words and action.  Among other things, CPG incurred expenses exceeding $30,000.00 in its analysis of the Property's permits, including but not limited to fees paid to its consultants.

7

36.     At the end of December 2011, Mr. Karp sought another meeting to discuss the terms of a prospective deal.

37.     In January 2012, Ambassador Cabrera and Mr. Karp met to discuss the details of a potential deal.  Again, CPG and Ambassador Cabrera discussed either an outright sale of the Property to CPG, or a joint development venture whereby Plaintiffs would remain partially involved with the commercial development of the Property, as minority shareholders.

38.     Mr. Karp and Ambassador Cabrera continued their discussion of the potential deal structure throughout 2012.  Ambassador Cabrera understood that the only obstacle to finalizing the terms of a deal was the acquisition of commercial zoning.

**IV.     Barza Seeks A Loan Extension**

39.     In the summer of 2012, Barza sought to restructure the Loan, which, after an initial extension, became due on October 26, 2012.

40.     Barza's previous effort to extend the due date on the Loan had posed no difficulty, in light of the company's longstanding relationship with the lender, Banco Popular, and the small size of the Loan relative to the high value of the Property that collateralized it.

41.     Barza sought a one-year extension of the Loan.  Alternatively, Barza also made an offer to buy the promissory notes underlying the Loan from Banco Popular directly.

42.     In response, Banco Popular elected to forbear and continued to automatically withdraw interest payments from Barza's account as they came due.

**V.     CPG Purchases Barza's Note**

43.     During this time period, however, and unbeknownst to Barza, CPG was acting behind the scenes to prevent any refinancing of the Loan by purchasing it from Barza's lender (the "Distressed Debt Transaction").

44.     CPG -- which knew about Barza's Loan based on its due diligence on the Property -- disrupted Barza's attempts to refinance its Loan with Banco Popular.

45.     CPG acquired the Loan in the Distressed Debt Transaction so that it could call the Loan, put financial pressure on Plaintiffs, and induce them to sell the Property at a significant discount.

## VI.     The Property Receives Critical Permits And Zoning Designations

46.     While CPG schemed, Plaintiffs continued to act in good faith.  In August 2012, the Property was granted commercial zoning -- the second criterion underlying the $33 appraisal.

47.     In late 2012, the Property also received a series of additional permits needed for development.

48.     As of result of their work, Plaintiffs were approached by other developers interested in the Property.

49.     Between October 2012 and February 2013, Barza and KRB Universal Investments ("KRB") negotiated terms for a deal whereby KRB would purchase the Property.

50.     But, on February 5, 2013, Ambassador Cabrera met with Mr. Karp.  During that meeting, Mr. Karp confirmed that CPG was ready to enter into a binding purchase agreement for the Property.  Mr. Karp and the Ambassador agreed to the basic terms of CPG's purchase of the Property.  Notwithstanding their progress, Mr. Karp indicated to Ambassador Cabrera that he was too preoccupied with other work to focus on closing on the Property over the next thirty days.  Mr. Karp, however, re-emphasized that CPG wanted to close a deal on the Property, and expressly stated that if Plaintiffs waited one month, CPG would make its official binding offer.

51.     In exchange for the promise of an offer (the "CPG Offer"), Mr. Karp asked Plaintiffs to (i) cease their search for a buyer and/or business partner in connection with the

Property, and (ii) decline any intervening offers that might arise prior to the CPG Offer.  On

behalf of Plaintiffs, the Ambassador agreed.

**VII.   CPG's Scheme To Defraud Barza**

52.     On February 14, 2013, Ambassador Cabrera received a formal, written offer from

KRB for $33.2 million (the "KRB Offer").

53.     However, acting in good-faith reliance on Mr. Karp's assurance that the CPG

Offer would be made within thirty days, Ambassador Cabrera turned down the KRB Offer.  The

rejection of KBR's offer permanently damaged Plaintiffs' business relationship with KRB.

54.     In further reliance on the promise made by CPG, and pursuant to its belief that it

would soon be closing with CPG, on March 21, 2013, Barza directed one of its permit

consultants to forward the formal renovation permit for the Property to CPG's consultants.

55.     Despite Barza's good-faith compliance with its obligations, however, and its

continued provision of confidential information to CPG, upon information and belief, neither

CPG nor Mr. Karp ever intended to honor their word.  To the contrary, at the time CPG made its

promise to Barza on February 5, it was actively seeking to acquire Barza's Loan as part of the

Distressed Debt Transaction it was finalizing, in the hopes that this acquisition would allow CPG

to pressure Barza into selling the Property at fire sale prices, instead of its $33 million market

value.

56.     Nor did CPG *ever* honor its February 5 promise.  Plaintiffs never received the

CPG Offer in March 2013, which CPG had promised it would provide, and in reliance upon

which Barza had turned down a $33 million offer.

57.     Instead, on April 1, 2013, Barza received a notice from Banco Popular dated

March 25, 2013 indicating that the Loan had been sold.  On the same day, and together with the

10

notice from Banco Popular, Barza received a written notice from CPG also dated March 25, 2013, stating that its affiliate had acquired the Loan, and that all payments due thereunder should be paid to CPG's affiliate, the new Loan servicer.

58.    Upon information and belief, at the time that he induced Barza into agreeing to forbear from selling the Property to any other purchaser, Mr. Karp was well aware that the Distressed Debt Transaction would be consummated imminently, and that the portfolio CPG was acquiring would include Barza's Loan.

59.    Furthermore, upon information and belief, at the time that Mr. Karp induced Plaintiffs into forgoing other offers to purchase the Property, he knew that (i) after the Distressed Debt Transaction closed, CPG would immediately pressure Barza through its ownership of the Loan to get an unfair bargain on the Property; and (ii) that CPG never actually intended to make an offer for the Property, as he had lead Plaintiffs to believe.

**VIII.   In Good Faith, Plaintiffs Seek To Mitigate Their Damages**

60.    Despite their shock at CPG's conduct, Plaintiffs sought to salvage their investment in the Property.

61.    In April 2013, Ambassador Cabrera informed Mr. Karp that the Loan had been included in the portfolio CPG purchased in the Distressed Debt Transaction.  Mr. Karp denied having any prior knowledge of this fact.  But, despite his promise and ongoing negotiations to acquire the Property, he did nothing to intercede on Plaintiffs' behalf with regard to the Loan.

62.    Thus, on April 22, 2013, Barza's counsel sent CPG's affiliate loan servicer a letter memorializing a previous request that CPG grant an extension on the same terms Barza had previously sought from Banco Popular.  CPG refused to extend the Loan, and instead demanded immediate repayment of all outstanding balances.

63.     Left with no other choice, Plaintiffs liquidated assets to raise the money necessary to repay the outstanding Loan.  On May 10, 2013, Barza conveyed to CPG's affiliate loan servicer a cashier's check for $1.13 million, equal to all outstanding principal and interest due on the Loan.

64.     In a letter accompanying the payment, Barza reiterated its objections to the purchase of the Loan in the middle of (i) Barza's own negotiations with Banco Popular; and (ii) in light of CPG's February 5 promise to Barza.

65.     CPG failed to acknowledge the issues raised in Barza's letter.

66.     While disappointed in Mr. Karp and CPG, Plaintiffs still believed that CPG's interest in the Property was real, and -- with its gambit to induce a fire sale thwarted -- that CPG would return to the negotiating table in short order.  In May 2013, Ambassador Cabrera reminded Mr. Karp of his February 5 promise, and inquired one final time about CPG's interest in the Property.

67.     Despite having been in regular contact with Ambassador Cabrera and Barza for the past two years, CPG and Mr. Karp unceremoniously cut all further communications with Plaintiffs about the Property, or otherwise.

## IX.    Plaintiffs Retain Defendants

68.     After two years of negotiating with CPG and rejecting, at CPG's behest, a solid offer for the Property, Plaintiffs were left with no qualified leads.  It was unclear to Plaintiffs whether CPG ever had any real interest in the Property at the appraised price, and if so, it was unclear whether the deal could still be resurrected.

69.     In the summer of 2013, Barza was referred to Stephen B. Meister, as an expert in the area of real estate law.  Barza retained defendant Stephen B. Meister and MSF in September 2013.

70.     The terms of Defendants' retention are summarized in a letter executed by Meister and Ambassador Cabrera (the "MSF Retainer Letter").  A true and correct copy of the retainer agreement is annexed hereto as Exhibit A.

71.      The MSF Retainer Letter specifically "confirms the Ambassador's retention of our Firm to represent him and his affiliates in a dispute with Caribbean Property Group . . . and its affiliates relating to undeveloped acreage in Puerto Rico."  In exchange for their representation of Plaintiffs, Defendants demanded upfront payment of a $10,000.00 initial retainer fee, plus entitlement to a 40% contingency fee in the event of a settlement, or 1% of the gross sale price of the Property in the event of a sale, as well as expenses.  Barza paid the initial retainer fee.

72.     At a meeting with Meister held in September 2013 at his New York offices, Defendants expressed that Plaintiffs had viable claims, and, more importantly, that setting forth those claims in a persuasive manner might be sufficient to compel CPG to finally complete the contemplated transaction and purchase the Property.  In particular, Meister stated explicitly that he had "exactly the right people for the job," and that he was a "regional expert" based partly on the fact that he had "saved CPG" in a property deal in Aruba.  Furthermore, Meister claimed that his prior working relationship with CPG would enhance his ability to drive CPG back to the bargaining table, and resolve the dispute without litigation.  Meister made clear, however, that in the event that a settlement could not be reached, he and his firm would protect Plaintiffs' interests in any potential litigation that might result from the dispute with CPG, up to and

13

including taking Plaintiffs' claims against CPG to trial.  Defendants, however, quickly abandoned Plaintiffs.

73.     Soon after his firm's retention was finalized, in October 2013, Meister reached out to Mr. Kirschner, the Chief Operating Officer and Principal of CPG, and a personal acquaintance of Meister's.  Mr. Kirschner immediately put to rest any notion that CPG would entertain purchasing the Property.  Meister reported, however, that Mr. Kirschner expressed a willingness to settle with Ambassador Cabrera for an unspecified sum.

74.     Notwithstanding the fact that CPG had broached the prospect of making some payment, Meister characterized his conversation with Mr. Kirschner as not having gone well, because CPG had made clear that Meister would not be successful in resurrecting a transaction. Making that deal would have permitted Meister to earn a substantial fee for virtually no work, thus, from his own perspective, the conversation indeed had not gone well.  Thereafter, Meister, who had previously sought to use his relationship with CPG as a selling point with Plaintiffs, was suddenly reluctant to press any claims against his former client.

75.     After that telephone call, instead of seriously considering, much less analyzing, the potential claims that Plaintiffs might be entitled to press against CPG if a transaction was not readily achievable, Meister abandoned work on the case.  Meister and MSF entirely failed to investigate any type of tort claim against CPG under Puerto Rican law, or the law of any jurisdiction.

76.     During subsequent communications between Meister and Ambassador Cabrera, Meister agreed to follow-up on his October 2013 telephone conversation with Mr. Kirschner with a demand letter (the "Demand Letter") detailing Plaintiffs' claims against CPG.  The Demand Letter was essential in Plaintiffs' view because, as Meister had initially led them to

believe, they thought a reasoned presentation of the claims available to Plaintiffs against CPG might cause CPG to reconsider consummating the purchase of the Property, or alternatively, cause CPG to offer a reasonable and fair financial settlement to avoid litigation.

77.     Unbeknownst to Plaintiffs, the conveyance of this Demand Letter was of critical importance for additional reasons.  Under Puerto Rican law, the Demand Letter would have constituted an extrajudicial demand sufficient to reset the statute of limitations on Plaintiffs' claims, particularly those sounding in tort, giving Plaintiffs additional time to bring claims based on CPG's conduct.

78.     However, Meister neither wrote the Demand Letter, nor took any other action to pursue Plaintiffs' claims.

79.     In particular, despite billing themselves as regional experts, Defendants took no action to investigate Plaintiffs' potential tort claims against CPG, arising under Puerto Rican law, including fraud, fraudulent inducement, and claims brought under Puerto Rico's doctrine of *culpa in contrahendo*, all of which are subject to a one-year statute of limitations period.

80.     Assuming that Plaintiffs' tort damages accrued on February 14, 2013 -- the date on which Barza turned down a $33 million offer in reliance on CPG's promise to provide an offer -- the statute of limitations on its Puerto Rican tort claims expired on February 14, 2014.

81.     This outcome was easily avoidable if Meister or his firm had done the minimum required of them as counsel, namely (i) investigate Plaintiffs' claims; (ii) draft and convey the Demand Letter prior to the expiration of claims, as they had promised to do; or, alternatively (iii) timely inform Plaintiffs that MSF had neither undertaken, nor intended to complete a thorough claims analysis, and that Plaintiffs would need to hire other attorneys to avoid potential expiration under relevant statutes of limitations.

15

82.     Instead, Defendants simply did nothing.  And, despite Plaintiffs' best efforts to reengage Defendants, including multiple attempts to communicate with Defendants, neither Meister, nor anyone else at MSF responded to Plaintiffs' inquiries.

83.     By the summer of 2014, Plaintiffs sought advice from another law firm who pointed them to precedent that could be helpful.  On July 27, 2014, Plaintiffs notified Defendants of the *Muniz* case.  *Muniz* is frequently cited in Puerto Rico for the history and application of the tort of *culpa in contrahendo*, or bad-faith termination of contractual negotiations.  Although this claim was viable, and was within the statute of limitations at the time that Defendants were retained, because Defendants had failed to undertake even the most basic research on applicable law, or -- at a minimum -- inform their client about the impending statute of limitations, this claim lapsed.

84.     Defendants' flagrant breach of their fiduciary duties as Plaintiffs' legal counsel came at a huge cost.  By utterly failing to even investigate Plaintiffs' tort claims -- much less inform Plaintiffs' about their existence, or the statute of limitations applicable to them -- Defendants ensured that the statute of limitations on Plaintiffs' Puerto Rican claims would expire before Plaintiffs could pursue an action for fraudulent inducement, promissory estoppel, and/or *culpa in contrahendo* against CPG.  Thus, Defendants directly harmed Plaintiffs by negligently and ineffectively performing their fiduciary duties as counsel, and failing to pursue Plaintiffs' tort claims in any way prior to the expiration of the governing statute of limitations.

85.     But for Defendants' negligence and breach of their fiduciary duty, Plaintiffs would have prevailed on tort claims against CPG under Puerto Rican law.  In the absence of Defendants' malpractice, Plaintiffs were likely to succeed on their tort claims.

86.    Unfortunately, however, by the time Plaintiffs learned that Defendants had abandoned their case, Puerto Rico's one-year statute of limitations for all such claims had run. Defendants' failure to inform Plaintiffs that they were at risk of losing their valuable remedies due to the impending expiration of the statute of limitations was inexcusable under any set of facts.

87.    Indeed, Defendants were ethically obligated to adequately familiarize themselves with the relevant law.  Defendants' failure to (i) pursue Plaintiffs' fraud claims; (ii) draft the Demand Letter; and (iii) inform Plaintiffs of the risk they faced due to Puerto Rico's one-year statute of limitations constituted clear cut malpractice.

## FIRST CAUSE OF ACTION

### Attorney Malpractice Against Defendants

88.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 87 as if fully set forth herein.

89.    As evidenced by the MSF Retainer Letter, Plaintiffs entered into a formal attorney-client relationship with Defendants on September 23, 2013, giving rise to fiduciary and other duties owed by Defendants to Plaintiffs.

90.    Defendants breached their duty to Plaintiffs by, among other things, failing to (i) investigate, analyze, or pursue Plaintiffs' tort claims against CPG; (ii) behave in a professionally reasonable manner with respect to their representation of Plaintiffs; (iii) sufficiently inform Plaintiffs concerning the nature of their case; (iv) draft and convey to CPG a demand letter that would have preserved Plaintiffs' tort claims, and which Defendants expressly promised they would do; (v) inform Plaintiffs that Defendants had not drafted or conveyed any demand letter to CPG; and (vi) inform Plaintiffs that, as a result of the impending expiration of the statute of

17

limitations applicable to their Puerto Rican tort claims against CPG, Plaintiffs were at risk of losing their right to pursue lucrative remedies against CPG.

91.     Defendants' breach directly harmed Plaintiffs.  Defendants' malpractice damaged Plaintiffs by causing them to lose the valuable remedies against CPG tied to their tort claims. But for Defendants' negligent failure to preserve Plaintiffs' tort claims -- either by pursuing them as they were hired to do, or, at a minimum, adequately informing Plaintiffs of the statute of limitations problem -- Plaintiffs would have been able to pursue claims for fraudulent inducement, promissory estoppel, and *culpa in contrahendo* against CPG.  Moreover, it is virtually certain that Plaintiffs would have prevailed on these claims, given CPG's flagrantly deceptive conduct.  The remedies available in connection with Plaintiffs' tort claims would have placed them in the same economic position they enjoyed at the time of the KRB Offer, which Plaintiffs would have accepted but for their good-faith actions in response to CPG's February 5 promise.  By ignoring Plaintiffs' tort claims, and negligently abandoning their client, however, Defendants allowed the statute of limitations to expire without informing Plaintiffs, and destroyed Plaintiffs' ability to pursue their valuable legal remedies.  Upon information and belief, the value of Plaintiffs' recovery against CPG would have exceeded $33 million.

## SECOND CAUSE OF ACTION

### Breach of Fiduciary Duty Against Defendants

92.     Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 91 as if fully set forth herein.

93.     As evidenced by the MSF Retainer Letter, Plaintiffs entered into a formal attorney-client relationship with Defendants on September 23, 2013, pursuant to which Defendants owed fiduciary duties to Plaintiffs.

94.     Defendants breached their fiduciary duties to Plaintiffs by, among other things, failing to (i) investigate, analyze, or pursue Plaintiffs' tort claims against CPG; (ii) behave in a professionally reasonable manner with respect to their representation of Plaintiffs; (iii) sufficiently inform Plaintiffs concerning the nature of their case; (iv) draft and convey to CPG a demand letter that would have preserved Plaintiffs' tort claims, and which Defendants expressly promised they would do; (v) inform Plaintiffs that Defendants had not drafted or conveyed any demand letter to CPG; and (vi) inform Plaintiffs that, as a result of the impending expiration of the statute of limitations applicable to their Puerto Rican tort claims against CPG, Plaintiffs were at risk of losing their right to pursue lucrative remedies against CPG.

95.     Defendants knowingly participated in this breach by, among other things, (i) ignoring Plaintiffs' requests for information and case updates; (ii) deliberately failing to analyze and pursue Plaintiffs' fraud claims; and (iii) deliberately failing to draft and convey to CPG the promised Demand Letter that would have preserved Plaintiffs' tort claims.

96.     Defendants' breach directly harmed Plaintiffs.  Defendants' malpractice damaged Plaintiffs by causing them to lose the valuable remedies against CPG tied to their tort claims. But for Defendants' negligent failure to preserve Plaintiffs' tort claims -- either by pursuing them as they were hired to do, or, at a minimum, adequately informing Plaintiffs of the statute of limitations problem -- Plaintiffs would have been able to pursue claims for fraudulent inducement, promissory estoppel, and *culpa in contrahendo* against CPG.  Moreover, it is virtually certain that Plaintiffs would have prevailed on these claims, given CPG's flagrantly deceptive conduct.  The remedies available in connection with Plaintiffs' tort claims would have placed them in the same economic position they enjoyed at the time of the KRB Offer, which Plaintiffs would have accepted but for their good-faith actions in response to CPG's February 5

promises.  By ignoring Plaintiffs' tort claims, and abandoning the fiduciary duties they owed to their clients, Defendants allowed the statute of limitations to expire without informing Plaintiffs, and destroyed Plaintiffs' ability to pursue their valuable legal remedies.  Upon information and belief, the value of Plaintiffs' recovery against CPG would have exceeded $33 million.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that a judgment be entered against Defendants as follows:

A.    Compensatory damages from the Defendants not less than $33 million;

B.    Punitive damages in such amount as may be deemed appropriate by the finder of fact;

C.    Recovery of all of Plaintiffs' attorney and other professional fees, expert witness fees, and costs and disbursements of the suit;

D.    Pre- and post- judgment interest at the maximum rate provided by law; and

E.    Such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

**PLEASE TAKE NOTICE** that, Plaintiffs hereby demand a jury trial for all issues so triable.

Dated:  October 4, 2016
        New York, NY

Respectfully submitted,

By:    /s/ Jennifer S. Recine
       Jennifer S. Recine
          (jrecine@kasowitz.com)
       Anthony M. Caputo Jr.
          (acaputo@kasowitz.com)
       KASOWITZ, BENSON, TORRES
          & FRIEDMAN LLP
       1633 Broadway
       New York, New York 10019
       Tel: (212) 506-1700

       *Attorneys for Barza Development Corp.,*
       *Zumon Corporation, and United States*
       *Ambassador Retired Cesar Cabrera*

## **VERIFICATION**

Pursuant to 28 U.S.C.A. § 1746 and Local Rule of the United States District Court for the Southern District of New York 9.1, I, Cesar B. Cabrera, president, CEO and sole owner of Barza Development Corp. and Zumon Corporation, hereby declare and verify under penalty of perjury under the laws of the United States of America that I have read the forgoing Complaint, and that the allegations contained therein are true and correct to the best of my knowledge, information and belief.

Executed on October 4, 2016, in San Juan, Puerto Rico.

_____

Cesar B. Cabrera